The next case is 23-7-9-4-7 Ogenyika Ikedilo v. Statter Hang on, let's let the commotion settle down a little bit. It looks like there's a lot of activity in the back of the room. I want you to have our undistracted attention when the time comes. I'll ask you while we're waiting though, is it Ofadili? Ofadila, your honor. Ofadila. Yes, I represent the appellant in this case, Dr. Ogenyika Ikedilo. Actually, I'm sorry to do this to you. There's just still a lot of commotion. I'll give you the signal and we'll restart your time at seven minutes. I didn't realize there was a whole other pack coming into the courtroom to hear your arguments. All right, Mr. Ofadila. Okay. The floor is yours. Your honor, this is one of those cases that as counsel one looks at the facts and as presented to the court below and gets this type of decision and wonders what type of facts ever could somebody bring to get remedy in a federal court. My client was the only black person in her class. And based on the rules of Montefiore Medical Center, in the first year she got missed expectations for promotion, the first fourth year. In the second fourth year, she got missed expectation to be promoted with all the evaluations very good. Even Dr. Stata who said she did not believe the evaluation given to my client, she only believed that given by Jacobi. Jacobi gave her 4.67 out of 5 in medical knowledge. She testified she didn't believe it because she gave my client one which is the worst possible claim in medical knowledge. Because she testified to in the record that it's the chair of the milestone committee who assigns the milestone and then when they go they discuss it. This is 892-3224. That's her testimony. And Dr. Ikedilo said she was there when she assigned that milestone. That is the reason why we are here. Because if she did what she was supposed to do, use the new innovation evaluations to assign the milestone, my client would have gotten another residency in another place and would have graduated. There would have been no lawsuit. But going to the motion for summary judgment, going to what the district judge ruled that my client could not make out the prima facie case, I believe that the district judge was wrong. First of all, my client was the only person required to get 30 percentile in up site. We have a Jewish, Dr. Stata is Jewish. There's a Jewish resident who got zero, one and zero, much less than my client who was promoted each year. And there were others who were not black. So that is important. And because you recognize that if the standard, Stata applied to my client, we applied to her, she would never have become a doctor. She got 16 and 20 percent in up site during her time. She failed the board. But for my client who is black, she has to impose a standard that she herself did not meet for her to move on. So can I ask one of the things that if this case were solely based on the ab site scores and the differential treatment relative to the ab site scores, that may be what this case is. But I understood that there is the reason that the ab site scores became important was because of questions about your client's clinical performance. And that's why she wasn't advanced from the fourth year to the fifth year the first time around. And that became the reason why the ab site scores took on greater significance. Am I misreading the record? Yes, you're not. You see, the most important thing is that this Dr. Stata signed in January that my client, the first PG, four PG, she said that my client met expectations. The advisor, Dr. Stone, said that my client met expectations. And then she, my client was given a contract. She signed it. I sent it back. And Dr. Stata waited for the contract, for the ab site score for the year to come. When that ab site score came, my client's score was low. Then she wrote, at that time my client was applying for a fellowship. Then she wrote, the e-mail is there, she wrote to the other professor, said don't give my client recommendations to get a fellowship. Can we back up to some of the clinical evaluations? Because you said there were no problems in the first year. I think that's roughly true. You said there were no problems in the second year. But in the second half of the second year, she's getting reviews that say she seemed distracted and not motivated. She needed to work on her timeliness. She was many times late to the OR and the clinic. She needs to work on her preparation. Another, Dr. Popola-Zova, said that your client's technical skills in the operating room are below the level of a PGY2. She's still getting passed through to the third year. But it seems to me there was a reason to be concerned, notwithstanding that she was rated at least a three on a numerical scale. But there's a lot of criticism even that year. And then it escalates in the third year. Well, Your Honor, it's important to know Dr. Stephen Conn, who has been the chair and the director, even in Yale and many other very reputable schools, said, we have that X-File report, that people get good and bad evaluations, comments. Even Dr. Stata admitted, yes, people get bad comments. And she herself will tell every student to improve in her comments. The problem we have there is that we only have the comments on the plaintiff. Even Dr. Van Smeet, who just came because she used Van Smeet and Moscarella, people who just come to the program, that's the people she uses for her hatchet jobs. Dr. Van Smeet gave bad evaluation to others. And I asked Dr. Stata, do you know whether Dr. Van Smeet gave bad evaluation to others? She said she doesn't know. She knows, but of course she wouldn't admit it. My client says that this doctor says she gave bad evaluations to everybody. So the issue is the picking out, you know. The issue is that it's only when it's against her. All the good comments was not used. And more importantly, all the bad evaluations that are used to justify this decision, where each one was made after the advice, once my client starts an administrative procedure, Dr. Stata commissions this one. So you cannot find one that, at least one that happened after, before the administrative, at least in the second year, the first year. Once she starts an appeal or says she doesn't agree with the decision of Stata, then Stata commissions this. And let me just say, which is very important, if I have opportunity I'll address it. A person acting in good faith do not truncate the administrative process. It's very clear in her brief. The reason she repeated the first PG-1, PG-4 year was for insubordination. Insubordination, not doing surgeries with Dr. Scott Melvin. But deliberately, insidiously, in an email, and we have it here, Stata said do it with Akin Morin. That's what the House Committee wants. And she did it. Stata goes back and reports that she refused to do it with Scott Melvin. So, and there are so many of them I can point at. For example, in her termination, she was told, when you get to each college, meet the professors who are your mentors. She did. She met three. And then, you know what Stata said? She didn't ask my client. She said she sent email to those doctors. Only one responded. The other two did not respond, so she assumed that my client didn't and terminated her. So this is, I mean, and there's more, many of these things. Somebody who is not acting based on race will not single my client out. We gave other examples. And a woman who is white who had treated a patient for three days straight and the patient died, it was asked to discuss the death. She said no. My client who saw the patient on the first day of admission was told to. She said, but I haven't seen the patient for four days. And she was told this is academic failure, you will be terminated. Another person who is not black was overslept. And my client was blamed. She couldn't be relieved. I'm curious. Another fact that distinguishes your client from many of these other people is her bearing children twice during the course of her residency. And I'm curious why you're emphasizing the racial discrimination rather than inferring that this was discrimination based on her pregnancy status. Well, we also believe that it's also discrimination based on pregnancy status. And we are, of course, arguing that the admission requirements were discriminatory. And let me just say, two times Dr. Stotter has tried to terminate my client. Each time they said she didn't have enough evidence. The second time, the standard was when it's arbitrary and capricious. The school found that the termination was arbitrary and capricious, not based on any evidence. And the rule was the issue presented was her admission. Then, within that two months, when she was, in fact, there was an e-mail, Stotter wrote, when do you expect your baby? She said November. The decision came that November when she gave birth to a baby. She has to pass USLM 3. She has to pass upside, above 30%. You know, so. Mr. El-Fadil, I sort of lost track of the time here, but you should probably wind it up. We'll hear from you again. Okay. All right. So, as we said, made clear in our brief, another thing is attached, the people admitted by Stotter. Only one black person, categorical. Okay. I think. And then you see all the people given categorical were Jewish and white admission. The evidence is there. She became director in 2013. All right. All right. Well, thank you. Mr. Field. Good morning, your honors. May it please the court. My name is Joseph Field from the law firm of Littler Mendelsohn. I represent the defendants at Pelley's in this case, Monitor Medical Center and Dr. Stotter, among the other individual defendant named physicians here. So we have two district court judges, Magistrate Judge Netburn and District Judge Abrams, both reached the same conclusion here, that the plaintiff failed to meet her burden on summary judgment to show but for plaintiff's race, that Dr. Stotter and others defendants would not have required her, Dr. Icodillo, to remediate her postgraduate year for, and then following that, to terminate her from the surgical residency program at Monitor. They're reviews de novo, right? Yes. That is correct. So why don't you tell us what you think, why you think the record warrants our concluding, too, that summary judgment is warranted. Okay. So essentially the decision here was based upon real-time feedback from more than a dozen physicians, not just at Montefiore, but also at Jacoby Medical Center, which is a sister hospital that operates with Montefiore in its surgical residency program. So these decisions were based on objective criteria, such as what your honors had already recognized, to be one of the key issues here, which is the plaintiff's continually poor abcite exam. So she scored between 1% and 7% on the abcite exam. But that was true of others in the program as well, right? That's correct, Your Honor. And her performance was pretty abysmal, but then that was also true. It wasn't that she just missed the 30% cutoff. She had single-digit scores many times. But then that was also true of other people in the program. Right. So counsel has mentioned some of the other people, and this is addressed in the district court decision, both in the report and recommendation as well as a decision adopting that. So we have the similar-situated standard under Shumway, and you have to show that these comparators are similarly situated in all material respects. So, for example, I'm not sure what the fact that Dr. Statter is Jewish or that these other residents are Jewish. This is not a religious discrimination case. But in any event, the other white residents who received poor abcite scores did not have any of the other, we say comorbidities, in effect, other factors such as poor reviews by attending physicians. So they didn't have those. I guess is it that the evidence shows they didn't, or we just don't know? They did not. And, Your Honor, if you ---- So we actually have their records of ---- Well, there's records, but there's also Dr. Statter, who is a program director. She submitted an affidavit on summary judgment. And let me just emphasize ---- No, no, no. I'm sorry. I'm getting stuck on this point. But just to make sure I understand, in terms of what the record in this case reflects about the other factors, the clinical performance of the other potential comparators, are you saying that the record gives us information from which we can conclude they are not comparable, or are you saying that plaintiff has the burden here and the record is devoid of evidence that can tell us that they are comparable? Well, plaintiff does have the burden, but we also have personal evidence, which is firsthand knowledge from Dr. Statter, the program director, about these other residents and comparing their performance. Yeah. I take it that the records of all of those other students exist and that they could have been sought in discovery by the plaintiff, right? Yes. Were they sought? No. Okay. Those records were not. So those records are not, in fact, in the record before us. And you're saying, on the one hand, there is some evidence in the form of Dr. Statter, who reviewed those people who said they're not comparable, and the plaintiff has nothing to contradict that. Is that the state of play, or am I misstating your position? Correct, Your Honor. Okay. And let me add one other thing I just wanted to mention, is that appellants counsel did not include Dr. Statter's reply declaration as part of the record, but that is in the district court, and I do reference it in my brief. But if there are any questions as to some of the arguments that the plaintiff made in their reply brief, some of them are addressed in Dr. Statter's reply declaration, which is document number 92 in the district court. And that reply declaration is, I believe, an 18-page, and it has exhibits to that as well. So as Your Honor pointed out, these problems did not exist, did not come out of nowhere. They existed early on in the plaintiff's second year. And these are not just the abcite scores or the fact that the plaintiff did not pass the USMLE Step 3, which is also a requirement to be promoted and to graduate from the program, but they go to her competency as a physician. But, you know, if you look at the scores that she got, I'm looking at page A, 1888, which is a chart of the plaintiff's scores. Now, I recognize that these scores are just numbers. I recognize that at least in law schools where I have taught, a B may not represent particularly outstanding performance or even above-average performance as at one time it might. Nevertheless, when you look at the scores, which apparently were important enough to be tallied this way, the plaintiff got lower scores, sometimes significantly lower scores, than her peer average. But it's still her scores range from a low of ones, in some cases, from some people, to a five by others. Her average comes out to things like 3.8 or 3.4, in one category, over four. They're lower than the average of her peers, but there's nothing here that remotely suggests that she was at the bottom of what her peers were. One of the things that Dr. Statter does talk about in her declaration, her moving declaration, is that numbers can be deceptive. I mean, getting a three, if you're in a one to five and you get a three, meaning expectations, counsel talked about that. But what is important from the standpoint of the program director and from the residency program itself is looking at substantive comments. Saying someone is a pleasure to work with or is doing fine is different than looking at comments saying that she struggles laparoscopically or that she cannot do a below-the-knee amputation or things of that nature, which are in the record from, again, numerous doctors. And this started with Dr. Van Smith. This was before she was put on remediation. And then the Jacoby group, which is a consensus review, and counsel has objected to that saying, well, these people didn't work with her. And it's quite common to have a consensus review where various doctors put in their opinions. And this could be based upon doing rounds with a person. They don't have to actually operate with them to give an opinion on their performance. But those comments are pretty consistent. And what you see in those comments, apart from the numbers, is that Dr. Gedillo had an appalling lack of medical knowledge, putting aside scores, and her operative procedures, and she admits this. I mean, this is also in the record. Dr. Gedillo says, I need to practice more. I need to study more. She recognized these things. And she didn't do it. She either didn't do it or couldn't do it. But the point is, she wanted to be a trauma surgeon. And apart from perhaps an airline pilot, there are a few professions where competency and skill are at such a forefront. So she wanted to be in this position. And just because I'm over six feet and I like basketball doesn't mean I can get into the NBA. So just as Dr. Gedillo had certain desires to become a surgeon, it doesn't mean that she had the capacity to do so. And, again, in addition, there were due process procedures that were observed here. So at both the remediation stage and then at the termination stage, there was an ad hoc review committee. So they reviewed that. Five or so different physicians reviewed that and allowed, in the second opportunity, yet another opportunity for Dr. Gedillo to try to redeem herself. And she could come back into the program. Reintegration was a term they used. Provided that, A, that she got at or above the 30th percentile on abcite, and, B, that she took and passed the USMLE Step 3. She wasn't able to do either, and that's why the decision stood. Your Honor, if you want to hear about the statute of limitations issue, I can address that briefly. I think we have all those. There are a lot of issues in this case that unfolded over several procedural stages. I'm not suggesting someone doesn't have a question, but we do have the briefs. And, oh, the one other thing I do want to point out is this is a discrimination case. So it's not a procedure case. It's not simply that, you know, Montefiore didn't follow its procedures or didn't, you know, give enough weight to this particular review or ignored something. This is what the district court looked at was there has to be evidence of some sort of discriminatory animus, some sort of action here based on- So the breach of contract counts might actually be processed claims potentially rather than discrimination claims? Well, the breach of contract claim is really simply related to the requirement that she get at above 30 percent on abcite as being a breach of the House Officers Agreement, which, as Your Honor can anticipate, is like a three- or five-page agreement, and it cannot anticipate every potential situation that may occur during a residency. And as the district court found, it is certainly reasonable and understandable that given the problems with medical knowledge, that requiring Dr. Codillo to get a 30 percent above an abcite was not a breach of any agreement whatsoever because the language of that agreement gives sole discretion to the medical center to make such determinations that go to the competency of the physicians. Well, I think we have your arguments in hand. I don't see any other questions forming, so thank you for your arguments. Thank you, Your Honors. And we will hear again from Mr. Ofadila. Your Honor, we did request specifically for the records of all the residents in the court below. They objected on being that this is protected by education, federal education. We cannot get the records. I've been in this business 30 years. I requested that. They objected. And there's nothing on the record other than status affidavits that others did not have problems. But when they objected, was there any adjudication by the magistrate judge as to the validity of that objection? I mean, there are remedies for this. It happens all the time in discovery. One party asks for everything. The other side says, we object to everything. Then there's some negotiation. Then eventually somebody comes to the judge and says, here are the things I still need, and they're refusing, and let's adjudicate. Did that ever happen here? No, not on this perspective. But, Your Honor, Dr. Stata, in fact, if one takes time to read the position transcripts. I'm sorry, I didn't catch that. Say that again, please. Dr. Stata, if one takes time to read her position transcripts, she never, all the things she said were the procedures and the objective and have to be applied. She has said, you know, the mentor is subjective. The mentor can declare that you met expectations and stamp it. It's good to go. Then when it came to plaintiff, she started, she never stood on anything, the procedures. But on that, the fact that there are subjective assessments of how effectively a surgeon is operating, that applies to everybody, right? It's a subjective assessment for every surgeon.  So that wouldn't be indicative of discrimination, am I right? No, but the problem here, Your Honor, is that she was never supervising my client. She did not believe the evaluations of those who did. In fact, general surgery and acute surgery, they gave her five, five, and four. General surgery gave her five over five on everything. She said she didn't believe that. Acute surgery gave her four of everything. She didn't believe that. Even in her final year, Jacobi trauma, as I said, gave her four. The average they gave her, I tabulated it, was about four over five on everything. She didn't believe that. So if a woman who could not believe anything my client got, on what basis can we prove anything? And going back to what Stata said, in fact, after that, we contradicted many things she said in her deposition. For example, she said she admitted Jida Ikeduku and another woman. But she did not admit them because she wasn't the program director. And talking about the consensus evaluation, it was done by her associate program director who did not supervise my client. How does a fair person bring somebody who is not part of the program, who works with her to go and conduct a consensus evaluation where some of the people did not even work with my client? Thank you. Thank you. Your time is up. Appreciate your arguments, both of you. We'll take this case under advisement.